## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**GUDRUN KASTRITIS, JOEDITH R.
DICE, HEATHER BUCHANAN, NIKKI
SIAS, and TANYA SIAS,**

      **Plaintiffs,**

**v.**

                             **Case No.: 6:09-cv-2105-Orl-35GJK**

**CITY OF DAYTONA BEACH SHORES,
TREVOR R. WYMAN, and SUSANNE
WILLIAMS,**

      **Defendants.**

_____/


**ANGELA GLENN,**

      **Plaintiff,**

**v.**

                             **Case No.: 6:10-cv-941-Orl-35GJK**

**CITY OF DAYTONA BEACH SHORES,
TREVOR R. WYMAN, and SUSANNE
WILLIAMS,**

      **Defendants.**

_____/

## ORDER

**THIS CAUSE** comes before the Court for consideration of Plaintiffs' Motion for

Partial Summary Judgment (Dkt. 53); the Motions for Summary Judgment submitted by

Defendants City of Daytona Beach (Dkt. 51), Trevor R. Wyman (Dkt. 50), and Susanne

Williams (Dkt. 49); and the responses thereto (Dkts. 60, 62, 56, 58, 57, 59, and 55).

Upon consideration of all relevant filings, case law, and being otherwise fully advised,

the Court hereby **DENIES** Defendant Wyman's Motion (Dkt. 50); **DENIES** Defendant

1

Williams' Motion (Dkt. 49); **DENIES** Defendant City's Motion (Dkt. 51); and **GRANTS in part** and **DENIES in part** Plaintiffs' Motion (Dkt. 53)

I.    **Background**

A.  **Case History**

On December 14, 2009, Gudrun Kastritis, Joedith R. Dice, Heather Buchanan, Nikki Sias, and Tanya Sias filed an action in federal court against the City of Daytona Beach Shores, and Daytona Beach Shores Public Safety Department Detective Trevor R. Wyman and Officer Susanne Williams (collectively "Defendants"), pursuant to 42 U.S.C. §1983, for, *inter alia*, violations of Plaintiffs' First and Fourth Amendment rights under the United States Constitution.  (Dkt. 1)  The Defendants moved to dismiss Plaintiffs' Complaint on February 16 and 19, 2010.  (Dkts. 18, 20, and 21)  After considering Defendants' motions and Plaintiffs' responses at (Dkts. 24-26), United States Magistrate Judge Gregory J. Kelly entered a Report and Recommendation on August 20, 2010, recommending dismissal of Counts III, VI, VII, and X, in their entirety. (Dkt. 30 at 37)  Judge Kelly also recommended that the district court dismiss Counts I and II to the extent Plaintiffs sought declaratory judgments against the Defendants.  (Id.) Judge Kelly also determined that the search warrant was overbroad in violation of the Fourth Amendment's particularity requirements and recommended that the district court find the search warrant unconstitutional.  (Id. at 28)  None of the Defendants objected to the Report and Recommendation.

On September 8, 2010—after conducting a careful and complete review of the findings and recommendations—this Court confirmed Judge Kelly's findings and adopted the Report and Recommendation as part of its Order.  (Dkt. 33)  A review of

the record reveals that on September 22, 2010, this case was consolidated for all further proceedings with an action brought against the same defendants by Angela Glenn[1] (hereinafter referred to, together with Ms. Kastritis, Ms. Dice, Ms. Buchanan, Ms. N. Sias, and Ms. T. Sias, as "Plaintiffs"), in the Middle District of Florida case. See Glenn v. City of Daytona Beach Shores, et al., Case No.: 6:10-cv-941-Orl-35GJK, Dkt. 36.  At that time, the Court designated Kastritis v. City of Daytona Beach Shores, et al., Case No.: 6:09-cv-2105-Orl-35GJK as the "Lead Case."  (Id. at 2)

Pursuant to the Court's September 8, 2010 Order dismissing some of the claims, the following claims remain at issue in this case:

- Counts I and II: Plaintiffs' damage claims against Defendant City and the individual Defendants for Fourth Amendment violations, pursuant to 42 U.S.C. § 1983;

- Count IV: Plaintiffs' claim for declaratory judgment against Defendant City for First Amendment violations, pursuant to 42 U.S.C. § 1983;

- Count V: Plaintiffs' claim for a permanent injunction against Defendant City for First Amendment violations, pursuant to 42 U.S.C. § 1983;

- Count IX: Plaintiffs' state-law claim for battery against Defendant City and Defendant Williams; and

- Count XI: Plaintiffs' state-law claim for intentional infliction of severe emotional distress against Defendant City and Defendant Williams.

**B.  Undisputed Facts**

---

[1] Ms. Glenn filed an action in federal court on June 18, 2010.  The allegations in her Complaint are nearly identical to those asserted by the other Plaintiffs.  See (Case No.: 6:10-cv-941-Orl-35GJK., Dkt. 1)

The following facts are undisputed in this case:

In January 2009, a confidential informant notified the Daytona Shores Department of Public Safety (the "Department") that some employees of Biggins Gentlemen's Club (the "Club") were selling prescription pills and other illegal narcotics to patrons.  (Wyman Aff't., Dkt. 50-2 ¶¶ 7-10; Fowler Aff't., Dkt. 49-8 ¶ 13)   The confidential informant also notified the Department that his/her friend, David Thomas, a manager at the Club, died from a drug overdose of Roxicodone that he purchased from an exotic dancer at the Club.  (Dkt. 1 at 55; Dkt. 53-4 at 60; Fowler Aff't., Dkt. 49-8 ¶ 13) From May 6, 2009 to September 16, 2009, Defendant Wyman, in his official capacity as a law enforcement officer for the Department, conducted an undercover investigation at the Club.  (Dkt. 1 at 56-60; Dkt. 53-4 at 54-60)   During the investigation three individuals, namely Rosalie Kain, Amanda Jean Deavers, and Rose Anna Marie Gustin, had engaged Defendant Wyman in illegal drug transactions while he was undercover as a patron in the Club.  (Dkt. 1 at 56-60; Dkt. 53-4 at 54-60; Wyman Aff't., Dkt. 50-2 ¶¶ 13-18)   Based on the information gathered during investigation, Defendant Wyman prepared an affidavit and warrant for a search of the Club, including vehicles in the parking lot and all persons inside the establishment.  (Dkt. 1 ¶ 34; Wyman Depo., Dkt. 53-3 at 10, 13)   The warrant was issued by Judge Michael Hutcheson of the Circuit Court in and for Volusia County.  (Dkt. 1 at 61; Dkt. 53-4 at 1)

On September 18, 2009, at approximately 10:00 p.m., Daytona Beach Shores Public Safety officers, including Defendants Wyman and Williams, executed a search warrant on the Club, located at 2324 South Atlantic Avenue in Daytona Beach Shores, Florida.  (Dkt. 1 ¶ 51; Fowler Aff't., Dkt. 49-8 ¶ 19)   Several officers, including Defendant

Williams, entered the dressing area in the Club and searched through the personal items of the exotic dancers, including those of the Plaintiffs.  (Dkt. 1¶ 55; Fowler Aff't., Dkt. 49-8 ¶ 19) All patrons inside the Club were detained for thirty (30) minutes while officers conducted a pat-down search on each of them and checked for outstanding warrants.  (Dkt. 1 ¶ 56; Wyman Depo., Dkt. 53-3 at 32)   Officers also detained and hand-cuffed all of the Club's employees and performers, including Plaintiffs, with "flexicuffs." (Dkt. 1 ¶ 59; Wyman Depo., Dkt. 53-3 at 30-31)  The employees, including Plaintiffs, were then directed to line up against a wall, questioned, and photographed. (Dkt. 1 ¶¶ 62, 64; Williams Depo., Dkt. 49-1 at 25-26)

During the execution of the warrant, Defendant Williams strip searched each of the Plaintiffs.  (Dkt. 1 ¶¶ 68, 129, 131; Williams Depo., Dkt. 49-1 at 44-52)  Plaintiffs Kastritis, Dice, Buchannan, and Glenn performed at the Club as exotic dancers.  (Case No. 6:09-cv-2105-MSS-GJK, Dkt. 1 ¶¶ 8-10; Case No. 6:10-cv-00941-MSS-GK, Dkt. 1 ¶ 9)  As exotic dancers, Plaintiffs Kastritis, Dice, Buchanan, and Glenn wore bikinis.  (Dkt. 1 ¶ 65; Williams Depo., Dkt. 49-1 at 35)    Plaintiffs N. Sias and T. Sias were employed at the Club as bartenders.  (Dkt. 1 ¶¶ 11-12) As bartenders, Plaintiffs N. Sias and T. Sias wore shorts, shirts and blouses.  (Dkt. 1 ¶ 67; Williams Depo., Dkt. 49-1 at 21-22) The vehicles belonging to the Plaintiffs were also searched.  (Fowler Aff't., Dkt. 49-8 ¶ 20)  The search warrant did not authorize a strip search of anyone in the Club.  See (Dkt. 1 at 61-63; Dkt. 53-4 at 1-3)

## II.    Standard of Review

Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of

law.  Fennell v. Gilstrap, 559 F.3d 1212, 1216 (11th Cir. 2009) (citing Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007)).   Which facts are material depends on the substantive law applicable to the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   The moving party bears the burden of showing that no genuine issue of material fact exists.  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

Evidence is reviewed in the light most favorable to the non-moving party. Fennell, 559 F.3d at 1216 (citing Welding Servs., Inc., 509 F.3d at 1356).   A moving party discharges its burden on a motion for summary judgment by showing or pointing out to the Court that there is an absence of evidence to support the non-moving party's case.  Denney v. City of Albany, 247 F.3d 1172, 1181 (11th Cir. 2001) (citation omitted).

When a moving party has discharged its burden, the non-moving party must then designate specific facts (by its own affidavits, depositions, answers to interrogatories, or admissions on file) that demonstrate there is a genuine issue for trial.  Porter v. Ray, 461 F.3d 1315, 1321 (11th Cir. 2006) (citation omitted).  The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value.").

### III.   Section 1983

Under Section 1983 of Title 42 of the United States Code ("Section 1983"),

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be

> liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress . . .

42 U.S.C. § 1983.  To sustain a claim under Section 1983, a plaintiff must demonstrate that a person acting under the color of state law deprived her of a federal right.  <u>See</u> <u>Cook v. Randolph County</u>, 573 F.3d 1143, 1151-52 (11th Cir. 2009).  Section 1983 is not a source of federal rights; rather, it "merely provides a method for vindicating [a specific] federal right[ ]."  <u>Cummings v. DeKalb County</u>, 24 F.3d 1349, 1355 (11th Cir. 1994).    Once the specific constitutional right has been identified, "the court must then apply the standard applicable to that particular provision to determine whether a constitutional violation actually occurred."  <u>Signature Pharmacy, Inc. v. Soares</u>, 717 F. Supp. 2d 1276, 1288 (M.D. Fla. June 10, 2010).

### IV.    Qualified Immunity

Qualified immunity shields a law enforcement officer who is sued in his or her individual capacity for alleged federal constitutional violations that may arise during the performance of his or her discretionary functions.  <u>Case v. Eslinger</u>, 555 F.3d 1317, 1325 (11th Cir. 2009) ("[Q]ualified immunity is a privilege that provides 'an immunity from suit rather than a mere defense to liability.'").  Qualified immunity applies so long as the officer's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Grider v. City of Auburn, Ala.</u>, 618 F.3d 1240, 1254 (11th Cir. 2010); <u>see</u> <u>Case</u>, 555 F.3d at 1325.    In invoking qualified immunity, the defendant officer must first prove that he was acting within the scope of his discretionary authority when the alleged unconstitutional act took place. <u>See</u> <u>Case</u>, 555 F.3d at 1325.

In assessing whether a defendant officer acted "within the scope of his discretionary authority," courts must consider whether he "was (a) performing a legitimate job-related function . . . (b) through means that were within his power to utilize." Brock v. City of Zephyrhills, 232 F. App'x 925-27 (11th Cir. 2007) (quoting Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004) (the Circuit Court "interpreted the term 'discretionary authority' to include actions that do not necessarily involve an element of choice, and emphasized that, for purposes of qualified immunity, a governmental actor engaged in purely ministerial activities can nevertheless be performing a discretionary function.")); see C.C. v. Monroe County Bd. of Educ., 299 F. App'x 937, 940 (11th Cir. 2008). In Brock, the Circuit Court concluded that "[t]he acts of obtaining and executing a warrant for an arrest and performing a search of a vehicle . . . qualify as discretionary functions of law enforcement officers." Brock, 232 F. App'x at 927-28.

After the defendant officer invokes qualified immunity, the plaintiff must then prove (1) that the officer violated her constitutional rights and (2) that the right was clearly established "*in light of the specific context of the case*, not as a broad general proposition." Case, 555 F.3d at 1326 (emphasis added). In examining whether the officer violated Plaintiffs' constitutional rights, the Court must consider "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Maiorano v. Santiago, No. 6:05-cv-107-Orl-19KRS, 2005 WL 1200882, at *7 (M.D. Fla. May 19, 2005) (internal quotation omitted); see Williams v. Kaufman, 352 F.3d 994, 1003 (5th Cir. 2003) ("The appropriate inquiry, therefore, is whether the state

of the law [at the time of the violation] gave [defendants] fair warning that their alleged treatment of [plaintiffs] was unconstitutional").

In establishing that the right was clearly established, Plaintiffs must point to decisions of the United States Supreme Court, the Eleventh Circuit Court of Appeals, or the highest court of the pertinent state, in this case, the Supreme Court of Florida, that provide clear notice of the violation.   McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007); Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000).   If an officer is reasonably mistaken, he or she should not face personal liability.   Maughon v. Bibb Cnty., 160 F.3d 658, 661 (11th Cir. 1998).   The officer is entitled to qualified immunity if the plaintiff fails to prove (a) that the officer violated the plaintiff's constitutional rights, and (b) that the right was clearly established. McClish, 483 F.3d at 1237.

## V.   Municipal Liability Under § 1983

In the Eleventh Circuit, "it is well established that a municipality cannot be held liable for a [Section] 1983 violation [solely] based upon the theory of *respondeat superior.*" Turner v. Jones, No. 10-14547, 2011 U.S. App. LEXIS 3760, at *16-17 (11th Cir. Feb. 23, 2011).   Instead, a municipality may be liable under Section 1983 if a plaintiff can show "(1) that [her] constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation."   Id. at 17 (quoting McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004)); see Monell v. Dept. of Social Svcs.of New York, 436 U.S. 658, 695 (1978) ("We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its

employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.").  The Circuit Court has determined that in establishing policy or custom, "it is generally necessary to show a persistent and wide-spread practice." Id. (quoting Depew v. St. Marys, 787 F.2d 1496, 1499 (11th Cir. 1986)).

Eleventh Circuit case law provides that:

> [M]unicipal liability under 42 U.S.C. § 1983 may be premised upon a single illegal act by a municipal officer only when the challenged act may fairly be said to represent official policy, such as when that municipal officer possesses final policy making authority over the relevant subject matter.

Maschmeir v. Scott, 269 F. App'x 941, 943 (11th Cir. 2008).  "Final policymaking authority over a particular subject area does not vest in an official whose decisions in the area are subject to meaningful administrative review." Scala v. City of Winter Park, 116 F.3d 1396, 1401(11th Cir. 1997); see Doe v. School Board of Broward County, 604 F.3d 1248, 1264 (11th Cir. 2010).  The delegation of authority does not absolve the policymaker of liability for his decisions.  Scala, 116 F. 3d at 1399 (quoting Mandel v. Doe, 888 F.2d 783, 792 (11th Cir. 1989)).

## VI.  Analysis

### A. Count I: Defendant Wyman Is Not Entitled to Qualified Immunity and May Be Personally Liable Under Section 1983 For A Violation of Plaintiffs' Fourth Amendment Right (Defective Search Warrant)

Plaintiffs contend that the warrant upon which Defendant Wyman relied was overbroad, lacked particularized probable cause, and was supported by an affidavit that contained false information. (Dkt. 1 ¶ 116)  Plaintiffs further argue that a general warrant, such as the one relied on by Defendant Wyman, is unconstitutional, as is all

evidence obtained through its execution.  (Id. ¶¶ 119-120) Specifically, they contend that:

> Wyman's actions in executing the fraudulent and misleading Affidavit for Search Warrant, applying for a facially overbroad Search Warrant, and assisting in the execution of the illegal search of Biggins Gentlemen's Club and the Plaintiffs, were taken intentionally, maliciously[,] and with complete disregard for the Plaintiffs' constitutional rights.

(Id. ¶ 122)  Defendant Wyman maintains that he is protected from suit by the doctrine of qualified immunity because his actions were not "so obviously wrong" or "plainly incompetent" that it can be fairly said that no reasonable officer in his circumstance would have acted in the manner that he did.  (Dkt. 50 at 7)  Defendant Wyman also contends that his investigation of the Club in the weeks leading up to the raid "produced ample probable cause to generate the warrant, and [that] the law with regards to 'all persons' warrants is not so well established that any knowing violation of the law on these facts may be found."  (Id.)

> 1.  Whether Defendant Wyman Was Acting Within the Scope of His Authority At the Time of the Alleged Constitutional Violations

The first prong of the qualified immunity analysis—whether the officer was acting in the scope of his discretionary authority when the alleged unconstitutional act took place—is not in dispute with regards to Plaintiffs' constitutional claims against Defendant Wyman.  It is undisputed that at the time he drafted and executed the warrant Defendant Wyman was acting within the scope of his official duties as a detective with the Daytona Beach Shores Police Department.  (Dkt. 53-3 at 5)  The Court, therefore, next considers whether: (1) Defendant Wyman violated Plaintiffs' Fourth Amendment right to be free from unlawful searches and seizures, and (2) whether that right was clearly established.

2. Plaintiffs Have Demonstrated that Defendant Wyman Violated Their Fourth Amendment Right By Relying On An Overbroad Search Warrant

The Fourth Amendment provides in pertinent part that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, *and particularly describing the place to be searched, and the persons or things to be seized."* U.S. CONST. amend IV (emphasis added). "It is well established that "a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional." Signature Pharmacy, 717 F. Supp. 2d at 1292 (citing Groh v. Ramirez, 540 U.S. 551, 564 (2004) (quoting Massachusetts v. Sheppard, 468 U.S. 981, 988 (1984)).

In Ybarra v. State of Illinois, 444 U.S. 85 (1979), the Supreme Court held that "'open-ended' or 'general' warrants are constitutionally prohibited. It follows that a warrant to search a place cannot normally be construed to authorize a search of each individual in that place." Ybarra, 444 U.S. at 91, n.4. In Ybarra, a judge issued a warrant authorizing the search of a tavern and the bartender for evidence of the possession of a controlled substance. Id. at 88. After entering the tavern, the officers announced their intent to conduct a "cursory search for weapons." Id. While searching one of the customers, Mr. Ybarra, an officer discovered a cigarette pack that contained packets of heroine. Id. The trial court denied Mr. Ybarra's motion to suppress the contraband "finding that the search had been conducted under the authority of an Illinois statute which allows law enforcement officers executing a search warrant to detain and search *any person* found on the premises." Id. at 89. The Illinois Appellate Court "affirmed Ybarra's conviction, and the Illinois Supreme Court denied his petition for leave to appeal." Id. at 90. The United States Supreme Court ultimately reversed the

state court and held that the officers lacked probable cause, based on the search warrant, to believe that any person other than the bartender would be violating the law. Id.  The Supreme Court held that the heightened probable cause standard that governs searches and seizures requires that "a search or seizure of a person **must** be supported by probable cause particularlized with respect to that person."  Id. at 91 (emphasis added).  Relying on Ybarra, the Eleventh Circuit has also reasoned:

> Defendants have cited no authority that even suggests that the search and seizure of one suspect in a public place can be bootstrapped into probable cause for a broad-based search of the business establishment and its patrons.

Swint v. City of Wadley, Ala., 51 F.3d 988, 997 (11th Cir. 1995); see United States v. Martinez, 317 F. App'x 929, 936-37 (11th Cir. 2009).  "This Circuit's case law has clearly established that [m]ere presence at the scene of a crime, without more, does not support a finding of probable cause to arrest."  Holmes v. Kucynda, 321 F.3d 1069, 1081 (11th Cir. 2003) (internal quotation omitted).  This particularity requirement applies even if the person searched "is an object of the government's suspicion that led to the search of the premises."  United States v. Sporleder, 635 F.2d 809, 814 (10th Cir. 1980).

The officer executing the search warrant has a duty to ensure that he is executing a valid search warrant.  Signature Pharmacy, 717 F. Supp. 2d at 1292  (It "is incumbent on the officer executing a search warrant to ensure the search is lawfully authorized and lawfully conducted.").  "This is 'not a duty to proofread; it is, rather, a duty to ensure that the warrant conforms to constitutional requirements.'"  Id.  "[A] warrant may be so facially deficient—i.e., failing to particularize the place to be

searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." United States v. Leon, 468 U.S. 897, 923 (1984).

This Court has already concluded that the affidavit and warrant upon which Defendant Wyman relied "provide[d] no particularized showing which would justify a search of the Plaintiffs" and "a reasonable officer would not have acted on an unparticularlized search warrant." (Dkt. 30 at 28)  In the order granting in part and denying in part the motions to dismiss, the Court opined that:

> Although the Affidavit indicates that "most" exotic dancers working at the Club are selling prescription pills (Doc. No. 1 at 56), that does not rise to the level of particularity required by the Fourth Amendment and because the Search Warrant allegedly authorizes the search of all persons present, is more akin to a constitutionally prohibited general warrant. *Ybarra*, 444 U.S. at 91.

(Dkt. 30 at 28, n.8)  The Court did not come to a conclusion regarding the validity of the warrant based on an analysis that construed the unsworn allegations in a light most favorable to Plaintiffs.   Rather, the Court determined that the warrant was unconstitutionally overbroad after conducting an independent review of the text of the actual warrant. See (Id. at 5, n.2).   A review of this record reveals that none of the Defendants objected to the Report and Recommendation, as permitted by FED. R. CIV. P. 72(b)(2).   This Court adopted Judge Kelly's findings and analysis as part of its Order on September 8, 2010.  (Dkt. 33) In consideration of the parties' summary judgment motions and the record evidence, the Court's opinion remains unchanged: The evidence of record demonstrates that Defendant Wyman violated Plaintiffs' Fourth Amendment rights by conducting a search pursuant to a facially defective search warrant.

Specifically, the record evidence shows that the "all persons" warrant failed to state, with particularity, the persons or items to be searched and/or seized.  The search warrant permitted state, city, and county law enforcement officers to search and seize the following:

> [T]he [2324 South Atlantic Avenue, Daytona Beach Shores, Florida, 32118] premises] together with the yard and cartilage thereof, **including any vehicles located within the cartilage and any persons therein,** for the property described in this warrant[, listed as: "Cannabis and all associate derivatives, items used for the sale and/or consumption of cannabis and/or items used to manufacture and/or distribute cannabis, Cocaine and all associate derivatives, items used for the sale and/or consumption of cocaine and/or any controlled schedule prescription narcotic and/or items used for the sale and/or consumption of the prescription narcotic and/or drug paraphernalia, books, papers and/or records of drug sales, transactions and/or customers and /or US currency derived from the sale of cannabis"], and if the same of any part thereof be found, you are hereby authorized to seize and secure same, giving proper receipt therefore and delivering a completed copy of this warrant to the person in control of the premises, or in the absence of any such person, leaving a completed copy where the property is found, and making a return of your doings under this warrant within ten (10) days of the date hereof . . .

(Dkt. 53-4 at 1-3) (emphasis added) The search warrant also indicated that the following persons occupied or controlled the premises: Rosalie Kain aka Destiny, Amanda Jean Deavers aka Candice, Rose Anna Marie Gustin aka Deja, "the front door manager only known as 'Bill,] and/or any other person(s) unknown."  (Id. at 2)  None of the Plaintiffs were named in the search warrant.

The evidence of record also shows that Defendant Wyman lacked individual probable cause to believe that any of the Plaintiffs had engaged in illegal drug activity. In his deposition testimony, Defendant Wyman admitted that he lacked probable cause

to search the particular Plaintiffs and that, at best, he had only a "reasonable suspicion"

that some of the Club's exotic dancers were dealing drugs:

> Q. Did you observe drug transactions between any of the performers other than the ones that you've identified specifically in your affidavit?
>
> A. No, sir.
>
> Q. Did you observe any drug transactions between patrons and performers?
>
> A. No, sir.
>
> . . . .
>
> Q. Do you know who drafted the search warrant?
>
> A. I did.
>
> . . . .
>
> Q. And what probable cause did you have to believe that all of the performers in the club were involved in drug transactions?
>
> A. Well, I would have reasonable suspicion when I would conduct a transaction with one exotic dancer and she, in turn, would go to the back locker room where there would be other dancers and then she would come out with the pills. I don't know if she was getting them out of her property or if she was going to a different dancer to obtain the pills and then bring them to me as a middleman. That, I couldn't tell you.
>
> . . . .
>
> Q. Other than [the belief that drugs were readily available at Biggins], did you have any other reason to believe that all of the employees in Biggins were involved in drugs, as opposed to those that you actually observed involved in narcotics transactions?
>
> . . . .
>
> A. I can't say all the employees. All I can say is employees.
>
> . . . .
>
> Q. And with respect to the [photographs of Plaintiffs] in front of you, did you observe any of them participating in drug transactions at Biggins?
>
> A. No, sir.

Wyman Depo., Dkt. 53-3 at 12, 15, 17, 21, 36.

Also, neither the search warrant nor the underlying affidavit evinces any factual basis to support a probable cause determination with regards to the bartenders, N. Sias and T. Sias.  In that regard, Defendant Wyman testified to the following:

> Q. Did you have – did you participate in any drug transactions with the bartenders employed by Biggins?
>
> A. No, sir.
>
> Q. Did you observe the bartenders engage in any suspicious activities that might be drug related?
>
> A. No, sir.

Id. at 17.

Public Safety Chief Stephan Dembinsky ("Chief Dembinsky") also testified that the Department lacked probable cause to believe that any Plaintiffs were involved in illegal drug activity:

> Q. Is there any information, any listing of names of people that your officers believe were involved in drug sales at Biggins, other than the specific listing that we see in the search warrant and the application?
>
> A. No.
>
> Q. Is it fair to say that the Plaintiffs were searched in this case because they worked at an establishment where other people were known to sell drugs?
>
> A. They were included in the search warrants as employees of the business, yes.

Dembinsky Depo., Dkt. 53-1 at 48.

The law is clear that "probable cause" and "reasonable suspicion" are different. Illinois v. Wardlow, 528 U.S. 119, 123-24.  "Reasonable suspicion" is not adequate justification for a search and seizure; rather, a search warrant must only be issued upon a showing of particularlized probable cause.  See Ybarra, 444 U.S. at 91; see also Swint, 51 F.3d at 997.

Upon consideration of the foregoing, this Court concludes that the record evidence overwhelmingly shows that the search warrant upon which Defendant Wyman relied was overbroad and failed to state, with any particularity, any probable cause to search Plaintiffs.   Furthermore, the record evidence demonstrates that Defendant Wyman lacked probable cause to believe that any of the Plaintiffs had engaged in any illegal activity.   Accordingly, Plaintiffs' claim that Defendant Wyman violated their Fourth Amendment rights has been established from this record.

### 3.   Plaintiffs' Fourth Amendment Right was Clearly Established

In the instant motion, Defendant Wyman contends that "[e]ven if the Court finds that the warrant was overbroad, [he] is still entitled to qualified immunity on the issue of whether or not the law was clearly established."  (Dkt. 50 at 21)  Defendant Wyman argues that the Supreme Court has declined to explicitly state that "all persons" warrants are overbroad.  The Court rejects this argument.  It is clearly established law that (1) a search warrant must be particularized and (2) that the standard to support a search and seizure is probable cause, not reasonable suspicion.  Signature Pharmacy, 717 F. Supp. 2d at 1292; Ybarra, 444 U.S. at 90-91.  In his Motion for Summary Judgment, Defendant Wyman concedes that Ybarra requires "that the search or seizure of a person must be supported by probable cause particularized with respect to *that* person." (Dkt. 50 at 15) (emphasis in original).

Upon consideration of the foregoing, the Court **DENIES** Defendant Wyman's Motion for Summary Judgment and determines that he is not entitled to qualified immunity on these facts.

**B. Count II: There Is A Genuine Issue of Material Fact In Dispute Regarding Whether Defendant Williams Is Entitled to Qualified Immunity for A Violation of Plaintiffs' Fourth Amendment Right (Illegal Strip Search)**

Plaintiffs contend that Defendant Williams knowingly violated their Fourth Amendment rights by conducting an illegal strip search. (Dkt. 1 ¶ 129) Plaintiffs argue that Defendant Williams "knew that there was no legal basis to conduct a strip search of the Plaintiffs and that such a search [violated] Plaintiffs' Fourth Amendment rights." (Id. ¶ 131) Defendant Williams maintains that she is protected from suit by the doctrine of qualified immunity because her actions were not "so obviously wrong" or "plainly incompetent" that it can be fairly said that no reasonable officer in her circumstance would have acted in the manner that she did. Additionally, she contends she is absolutely absolved from liability as a matter of law because she relied on the direction of her superior, Sergeant Michael Fowler. (Dkt. 49 at 7)

As an initial matter, the evidence of record reveals that Defendant Williams initially participated in the execution of the search warrant on the Club by securing "the female bathroom, detain[ing] people and prevent[ing] evidence tampering." (Dkt. 53-2 at 20); Williams Depo., Dkt. 49-1 at 17. In this regard, Defendant Williams "adopts the arguments . . . made by Detective Trevor Wyman in his Motion for Summary Judgment regarding the legality of the warrant." (Dkt. 49 at 9) As this Court discussed in Section IV.A of this Order, the search warrant was overbroad and unconstitutional, and a reasonable officer would not rely on it as a basis for conducting a search.

However, there is substantial evidence on this record to support a finding that Defendant Williams had no knowledge of the substance or scope of the search warrant and participated in the raid at the direction of a superior officer, which has created a

factual dispute regarding the reasonableness of her actions.  Williams Depo., Dkt. 49-1 at 11-15, 17, 23, 58.  Whether her reliance on the instructions of a superior officer was reasonable is a material issue of fact that is not resolved on this record, as explained in more detail in the subsequent section of this Order.

Nevertheless, the record evidence clearly establishes that Defendant Williams went beyond securing the female bathroom in the Club and strip searched the individual Plaintiffs.  The Court now considers the legality of that strip search.

> 1.  Whether Defendant Williams Was Acting Within the Scope of Her Authority At the Time of the Alleged Constitutional Violations

The first prong of the qualified immunity analysis—whether the officer was acting in the scope of her discretionary authority when the alleged unconstitutional act took place—is not in dispute with regards to Plaintiffs' constitutional claims against Defendant Williams.  It is undisputed that at the time she conducted the strip search, Defendant Williams was acting within the scope of her discretionary authority as an officer with the Daytona Beach Shores Police Department.   (Dkt. 1 ¶ 15); Williams Depo., Dkt. 49-1 at 10-12  The Court, therefore, next considers whether: (1) Defendant Williams violated Plaintiffs' Fourth Amendment right to be free from unlawful searches and seizures, and (2) whether that right was clearly established.

> 2.  Plaintiffs Have Demonstrated that Defendant Williams Violated Their Fourth Amendment Right By Conducting a Strip Search Without Probable Cause

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, and unreasonable searches and seizures."  U.S. CONST. amend IV (emphasis added); Sims ex rel. Sims v. Forehand, 112 F. Supp. 2d 1260, 1280 (M.D. Ala. 2000).  The Supreme Court has held that "wherever an individual

may harbor a reasonable 'expectation of privacy' [the Fourth Amendment entitles the person] to be free from unreasonable governmental intrusion." <u>Terry v. Ohio</u>, 392 U.S. 1, 9 (1968).  Thus, "[t]he Fourth Amendment is violated when the government conducts an unreasonable search in an area where a person has a reasonable expectation of privacy." <u>Justice v. City of Peachtree</u>, 961 F.2d 188, 191 (11th Cir. 1992).

The Eleventh Circuit has recognized an individual's constitutional right to bodily privacy.  The Circuit Court has held:

> We are persuaded to join other circuits in recognizing a prisoner's constitutional right to bodily privacy because <u>most people have a special sense of privacy in their genitals and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating</u>."

<u>Fortner v. Thomas</u>, 983 F.2d 1024, 1030 (11th Cir. 1993) (emphasis added) (citing <u>Lee v. Downs</u>, 641 F.2d 1117, 1119 (4th Cir. 1981); <u>Covino v. Patrissi</u>, 967 F.2d 73, 78 (2d Cir. 1992); <u>Sepulveda v. Ramirez</u>, 967 F.2d 1413, 1415 (9th Cir. 1992); <u>Michenfelder v. Sumner</u>, 860 F.2d 328, 333-34 (9th Cir. 1988)).  In <u>Safford Unified School Dist. No. 1 v. Redding</u>, -- U.S. --, 129 S.Ct. 2633, 2641 (2009), the United States Supreme Court appears to suggest that a strip search requires some justification over and above the probable cause required for a search and seizure of an individual's general person and belongings.  The Supreme Court held:

> <u>The very fact of Savana's pulling her underwear away from her body in the presence of the two officials who were able to see</u> her necessarily exposed her breast and pelvic area to some degree, and both subjective and reasonable societal expectations of personal privacy **support the treatment of such a search as categorically distinct, requiring distinct elements of justification** on the part of the school authorities for going beyond a search of outer clothing and belongings.

Safford, 129 S.Ct. at 2641 (emphasis added).  In Stafford, the Supreme Court held that the level of suspicion did not meet the degree of intrusion of the strip search, and that "the search as actually conducted [must be] reasonably related in scope to the circumstances which justified the interference in the first place."  Id.

The Eleventh Circuit has held that there must be *particularized* suspicion in order to conduct a strip search of an individual.  Thomas ex rel. Thomas v. Roberts, 323 F.3d 950, 956 (11th Cir 2003) (strip searches of schoolchildren conducted without particularized suspicion were unreasonable); see also Sims v. Glover, 84 F. Supp. 2d 1273, 1283 (M.D. Ala. 1999) (relying on Ybarra, the court held that the deputies were not shielded by qualified immunity because "there [were] no facts upon which [the] deputies . . . could have possessed even arguable probable cause for the strip search"). So have other circuit courts.  See Williams, 352 F.3d at 1005 (Ybarra "clearly established that strip searches conducted without individualized reasonable suspicion or probable cause are unlawful"); see also Rivera v. United States, 928 F.2d 594, 606 (2d Cir. 1991).  In Rivera, the Second Circuit held that:

> Absent special circumstances, the police of course have the authority to detain occupants of premises while an authorized search is in progress, regardless of individualized suspicion. *See Michigan v. Summers*, 452 U.S. 692, 69 L. Ed. 2d 340, 101 S. Ct. 2587 (1981). They also have the authority to make a limited search of an individual on those premises as a self-protective measure. *See, e.g., United States v. Barlin*, 686 F.2d 81, 87 (2d Cir. 1982) (search of handbag of woman who had entered an apartment together with individuals known to be involved in drug transactions in the apartment constituted a reasonable, self-protective "minimal intrusion"). Beyond this general authority to detain persons and make limited security searches, however, there must be probable cause, or at least some degree of particularized suspicion, to justify further searches or seizures of individuals who are neither named in the warrant

> nor arrested as a consequence of the search. *See generally Ybarra v. Illinois*, 444 U.S. 85, 91-94, 62 L. Ed. 2d 238, 100 S. Ct. 338 (1979). Mere possession of a search warrant, for example, will not normally authorize strip searches of the occupants of the premises. *See generally Burns v. Loranger*, 907 F.2d 233 (1st Cir. 1990). A strip search is by its very nature a "highly intrusive invasion." *M.M. v. Anker*, 607 F.2d 588, 589 (2d Cir. 1979); *see Walsh v. Franco*, 849 F.2d 66, 69-70 (2d Cir. 1988); *Burns v. Loranger*, 907 F.2d at 235 n. 6 ("there can be no question that a strip search, by its very nature, constitutes an extreme intrusion upon personal privacy, as well as an offense to the dignity of the individual").

Rivera, 928 F.2d at 606-07 (emphasis added).

Under the law, a law enforcement officer may subject an individual to a strip search only upon a particularlized showing of probable cause that would justify "going beyond a search of the outer clothing and belongings." Stafford, 129 S.Ct at 2641; see Thomas, 323 F.3d at 956. In her Motion for Summary Judgment, Defendant Williams maintains that she searched the Plaintiffs upon Sergeant Fowler's—her superior officer—instruction to search the women "thoroughly." Williams Depo., Dkt. 49-1 at 33. Sergeant Fowler confirms that he instructed Defendant Williams to search the individual Plaintiffs. Fowler Aff't., Dkt. 49-8 ¶ 21; Fowler Aff't., Dkt. 51-3 ¶ 5. When asked during her deposition about the search, Defendant Williams expressly stated that Sergeant Fowler did not give her instructions on *how* to search the women. The manner in which she proceeded was based on her experience and not pursuant to any written or oral directive from a supervisor. Williams Depo., Dkt. 49-1 at 33-34, 61-62.

There are no credible facts on this record that suggest that the Plaintiffs had hidden contraband in their undergarments. Moreover, this record does not support a finding that the specific *suspects listed in the warrant* had hidden contraband in their undergarments. The affidavit underlying the warrant demonstrates that in all but two

occasions the exotic dancers listed as suspects in the warrant apparently (1) negotiated the sale of narcotics with undercover officer Wyman, (2) retrieved the narcotics from the employee locker room, and (3) then handed them over to Defendant Wyman in exchange for money:

> [A confidential informant] indicated the dancers keep the narcotics in the employee locker room in the rear of the establishment . . .  [on one occasion, Detective Wyman purchased Xanax from suspect R. Kain, who] **walked to the backroom where the exotic dancers utilize a locker room. Approximately ten (10) minutes later R. Kain came out from** the locker room walked directly over to Your Affiant and sat down on his lap.  She then **handed him two (2) prescription pills**, pink in color . . . [On another occasion, Defendant Wyman purchased narcotics from A. Deavers, who] **proceeded to the employee locker room area**.  Approximately 10 minutes later, A. Deavers exited the locker room area and proceeded to walk directly toward [Defendant Wyman] and sat down next to him cupping her right hand, as if she was hiding something.  **She then placed a clear plastic cigarette wrapper containing 10 Hyrdocodone [sic] tablets between [Defendant Wyman's] legs and the chair he was sitting in**  . . . [On yet another occasion, Defendant Wyman purchased narcotics from A. Deavers, who, again] **proceeded toward the employee locker room** where the exotic dancers change for the shift.  Approximately 15 minutes later A. Deavers walked over to [Defendant Wyman] and sat down next to him.  **She placed a rolled up white napkin in his lap** and told him, "Here put them in your pocket and I'll come back for the money in a minute."

(Dkt. 53-4 at 46-57)  Defendant Wyman purchased narcotics from another dancer on two other occasions and the record evidence reveals that she retrieved narcotics from a dollar bill that was rolled up and attached to a garter belt that was secured to her thigh:

> [Defendant Wyman purchased narcotics from R. Gustin, who] **proceeded to unfold a large stack of $1.00 bills that she had secured on her leg utilizing a garter belt. She unfolded a $1.00 bill within the stack and retrieved 1 Roxicodone and handed it to [Defendant Wyman].**  [He] could see there were only approximately 4 or 5 pills there . . .

24

> [Defendant Wyman purchased narcotics from R. Gustin again five days later.  This time she] sat down next to [him] and **proceeded to unfold a large stack of money that was secured on her garter belt affixed to her thigh  . . . and handed [Defendant Wyman] 2 small white pills.**

(Id. at 50-51) (emphasis added) These facts do not implicate Plaintiffs in any illegal activity and do not constitute probable cause to violate their constitutional right to bodily privacy.   Defendant Williams clearly conducted a search of the Plaintiffs that was consistent with the definition of "strip search" in the Florida Statutes.

According to FLA. STAT. § 901.211, an officer conducts a "strip search" of an arrested person by having that individual "**remove or arrange** some or all of his or her clothing so as to permit a **visual or manual inspection** of the genitals; buttocks; anus; breast, in the case of a female; or undergarments of such person."  FLA. STAT. § 901.211 (emphasis added). Florida law provides that no individual shall be subjected to a strip search described above unless:

> (a)     There is probable cause to believe that the individual is concealing a weapon, a controlled substance, or stolen property; or
>
> (b)     A judge at first appearance has found that the person arrested cannot be released either on recognizance or bond and therefore shall be incarcerated in the county jail.

Id. at 901.211(2)(a)-(b).  Florida law also mandates that:

> (3) Each strip search shall be performed by a person of the same gender as the arrested person and on premises where the search cannot be observed by persons not physically conducting or observing the search pursuant to this section. **Any observer shall be of the same gender as the arrested person.**
>
> . . . .

> **(5) No law enforcement officer shall order a strip search within the agency or facility without obtaining the written authorization of the supervising officer on duty.**

Id. at  901.211(3), (5) (emphasis added).

Here, the Plaintiffs were not under arrest at the time of the search.   Additionally, the search warrant did not authorize a strip search of any individuals.  (Dkt. 1 at 61-63; Dkt. 53-4 at 1-3) Nevertheless, by her own admission, Defendant Williams subjected the exotic dancer Plaintiffs, who wore bikini attire (Dkt. 1 ¶ 65; Williams Depo., Dkt. 49-1 at 35), to the following:

> Q. Okay. Tell me, in that bar area, how did the search proceed or how did the individual searches proceed?
>
> A. I would feel along, pull out the bottom.
>
> Q. Now, When you say "feel along," are you putting your hands on the outside of the actual material?
>
> A. Yes.
>
> Q. Okay.  Do you put your hands inside the material to feel down or is it just outside?
>
> A. No.  Just outside.  Also I pull it out to see if anything falls out or anything like that.  Then I proceed to the bottoms, see - - feel along the edges.  Then, there, I would just pull out the top, the front portion, see if there's any contraband or anything like that.  The same with the back area.  If anything became exposed, I tried to fix them as best as possible and on to the next female.
>
> . . . .
>
> Q. Were you able to see - - when you pulled the front of the bathing suit out, are you able to see the external portions of the vaginal labia or anything of that nature?
>
> A. Yes.
>
> Q. Okay.
>
> A. The pubic area, yes.

. . . .

Q. Were you able to see the anal cleft area or the anus or anything back there in order to determine whether or not there was contraband?

A. The crack area, yes, the cleft area.

Williams Depo., Dkt. 49-1 at 44-46.

Defendant Williams searched Plaintiff Kastritis, who was wearing a dress, as follows:

Q. Describe for me, because of the differences in the outfit that Ms. Kastritis was wearing, how did you search Ms. Kastritis while she was in the closet?

A. I don't believe she had a bikini top on. The attire that she was wearing, I felt along the top area, pulled it, shaked it away from her body, to make sure no contraband. She did have, if I recall correctly, bikini bottoms on, and I did have her lift up her attire somewhat and then - - so I could, one, feel on the bikini line and also do like I did with the others.

Id. at 54. Similarly, Defendant Williams subjected N. Sias and T. Sias—the Plaintiffs who worked as bartenders—to the following:

Q. Tell me, since [N. Sias and T. Sias] were not wearing bikinis, but were in some semblance of street clothes, how you searched them.

A. Same thing, went along the top area, pulled their bra out, even though they had . . . [w]ent on the top area, pulled out their bra through their shirt, shaked it. Then went along their pants line, pockets, patted along up through their V of their - - in between their legs and then down, back pockets as well.

. . . .

Q. But for purposes of your search of these two girls, those tops, to your recollection, were they cut off at the midriff or did they go all the way to the pants?

A. I think they went all the way down.

Q. Okay. So when you search [N. Sias and T. Sias], describe for me how, like, particularly in 14, she's wearing what appears to be a black halter top of some sort, describe for me how you're searching her with the halter top. Are you running your hands down the outside of the shirt itself?

A. Yes, sir.

. . . .

Q. You must pull the shirt up somewhat, or do you just grab the bottom of the bra through the shirt?

A. Yes.

. . . .

Q. Did you expose any part of their breasts during any of those inspections - - or any of those searches?

A. I don't believe so. If I did, then I covered them up immediately.

Id. at 47-52

The record evidence also shows that Defendant Williams conducted a strip search of Plaintiffs in a well lit section of the Club in front of all persons who were still in the establishment, including the male officers in the operational team:

Q. Okay. Were the members of the operational team - - were they still in the building?

A. Yes, sir.

. . . .

Q. Were other officers - - when these searches were taking place in the bar area, were there other officers that were in the immediate area?

A. Yes, sir.

Q. And was the lighting turned up? I know we have a picture where it appears to be very bright there.

A. Yes, sir.

Q. And were these girls, as they were searched, were they in plain view of other people within the bar?

A. Yes, sir.

Williams Depo., Dkt. 49-1 at 44, 52; see also Dembinsky Depo., Dkt. 53-1 at 27.

Defendant Williams admitted that she was aware of the department's policy concerning strip searches and had even read the document. Williams Depo., Dkt. 49-1 at 34. The record evidence reveals that the department's written policy regarding strip searches is:

> **50.2.33** A strip search is a thorough search of the prisoner and their clothing. Clothing is removed, body cavities are checked and all clothing is carefully scrutinized. Defined in F.S.S. 901.211 as the removal or re-arrangement of some or all of the clothing so as to permit visual or manual inspection of the genitals, buttocks, anus, or breasts, in the case of a female, or undergarments of such person.
>
> . . . .
>
> Strip searches **will not** be conducted unless **all of the following** are met: **(CFA 2.03M)**
>
> - There is probable cause to believe the individual is concealing a weapon, controlled substance, or stolen property.
> - There is prior **written approval** by the Shift supervisor.
> - The search is performed by a person of the same gender and in such a manner that will protect the arrestee from being observed by persons not physically conducting or witnessing the search.
> - Persons arrested for minor offenses such as traffic, ordinance violations or misdemeanors **shall not** be strip searched.

Defendant City's Answers to Interrogatories, Dkt. 53-2 at 54. Despite the admitted knowledge of the policy, Defendant Williams subjected Plaintiffs to a strip search without probable cause or written authorization from a shift supervisor, and in full view

of the male officers of the police operational team.  Williams Depo., Dkt. 49-1 at 44, 52, 61; Dembinsky Depo., Dkt. 53-1 at 27.

The Court is not impressed by the arguments proffered by Defendants City and Williams that "nothing more could have been exposed during the searches than is normally revealed during the Plaintiffs' dances" somehow mitigates the illegality of the strip search.  (Dkt.  49 at 11; Dkt. 51 at 11, n.1)   Furthermore, there is no evidence on this record that the strip search was necessary for officer safety.  The record evidence would support a finding that Defendant Williams violated Plaintiffs' Fourth Amendment right to be free from unlawful strip searches.

> 3.   There Is A Genuine Issue of Material Fact In Dispute Regarding Whether Plaintiffs' Fourth Amendment Right Was Clearly Established

Even if Plaintiffs have demonstrated, from this record, that Defendant Williams violated their Fourth Amendment rights, the officer is nonetheless entitled to qualified immunity if it would not be clear to a reasonable officer that the search was illegal.

In establishing that the right was clearly established, Plaintiffs must show that Defendant Williams had clear notice that her actions were unlawful.  McClish, 483 F.3d at 1237; Priester, 208 F.3d at 926.   If an officer is reasonably mistaken, she should not face personal liability.   Maughon,160 F.3d at 661.   A defendant officer is entitled to qualified immunity if it was objectively reasonable for her to rely on the representation of a supervisor.   Brock, 232 F. App'x at 928.  In Brock, the Circuit Court held:

> **[The Defendant Officer] is entitled to qualified immunity because it was objectively reasonable for him to conclude that the search was lawful based on his supervisor's instruction.**  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."

> <u>Saucier</u>, 533 U.S. at 202, 121 S. Ct. at 2156. **Brock does not dispute [The Defendant Officer's] affidavit testimony that [he] was informed by his supervisor that Brock gave full consent to the search of his vehicle and home. Because a reasonable officer in [the Defendant Officer's] position would have believed the search was lawful, [he] is entitled to qualified immunity.** <u>See</u> <u>Anderson v. Creighton</u>, 483 U.S. 635, 641, 107 S. Ct. 3034, 3040, 97 L. Ed. 2d 523 (1987).

<u>Brock</u>, 232 F. App'x at 928 (emphasis added).

Here, Defendant Williams contends that a reasonable officer in her position would have believed that the search was lawful based on the instructions of her supervisor, Sergeant Michael Fowler. (Dkt. 49 at 14) Viewing the evidence in the light most favorable to the Plaintiff, the Court finds that the evidence does not bear out this contention.

 Sergeant Fowler and Defendant Williams testified that Fowler instructed Defendant Williams to search the Plaintiffs,  Williams Depo., Dkt. 49-1 at 33; Fowler Aff't., Dkt. 49-8 ¶ 21; Fowler Aff't., Dkt. 51-3 ¶ 5.   Although Defendant Williams maintains that she was told to search the women "thoroughly," she concedes she was not given instructions on *how* to conduct the search.  Williams Depo., Dkt. 49-1 at 33. She testified that the manner in which she proceeded was based on her experience and not pursuant to any written or oral directive from a supervisor.  <u>Id.</u> at 33-34, 61-62.

In addition, other facts on record create a dispute as to material fact concerning what Sergeant Fowler or any other superior officer actually told Defendant Williams during the operation briefing or while the execution of the search warrant was underway.

In an affidavit prepared in anticipation of litigation, Sergeant Fowler conceded that he told Defendant Williams to search Plaintiffs and that he was motivated by what experience has taught him about the habits of drug dealers:

> **I instructed Officer Williams to search the exotic dancers and barmaids**. This decision was based upon my experience and training in law enforcement which indicated that narcotic drugs could be and often are hidden in the underwear, lingerie, undergarments, genitalia and other private areas of the a [sic] suspect's body. The decision to search the exotic dancers and barmaids was also based upon information from the reliable confidential informants that most of the exotic dancers and female employees at Biggins were involved in the illegal sale of drugs**. The decision to search the underwear, lingerie, undergarments, genitalia and other private areas of the exotic dancers and barmaids was also based upon information disclosed during the briefing prior to the execution of a warrant. During that briefing, information was provided indicating that the dancers had concealed drugs in their undergarments.**

Fowler Aff't, Dkt. 49-8 ¶ 21 (emphasis added). Defendant Williams also testified that she attended a briefing prior to the execution of the warrant. Williams Depo., Dkt. 49-1 at 15-17. Whether Sergeant Fowler and Defendant Williams attended the same briefing and whether Defendant Williams received supplemental instructions regarding the strip search at this briefing from Sergeant Fowler or some other superior officer, is highly relevant to a finding on this issue. Notably, even in the affidavit Fowler only states that he "instructed Officer Williams to search the exotic dancers and barmaids." He does not mention strip search as part of his instruction—only as part of his mental impressions. Without a resolution of these disputed facts, this Court is not able to ascertain whether Defendant Williams is entitled to qualified immunity. The Court also notes that the principal policy maker, Chief Dembinsky, was present on the scene and observed the strip searches being conducted, yet he stood idly by as a spectator of sorts and did not

intervene to stop the searches or to address the manner in which they were being conducted. Whether this is viewed as some tacit instruction by the ultimate supervisor or merely evidence of the municipality's placing its imprimatur on the illegal conduct remains to be addressed at trial.

Accordingly, the Motions for Summary Judgment filed by Defendant Williams and Plaintiffs are **DENIED** as to this issue.

### C. Counts I and II: There Is A Genuine Issue of Material Fact in Dispute Regarding Whether Defendant City Is Subject To Municipal Liability Under § 1983

Plaintiffs allege that Defendant City violated their Fourth Amendment rights by acting on an overbroad search warrant and conducting an unconstitutional strip search. (Dkt. 2 ¶¶ 109-123, 125-132) Plaintiffs argue that Defendant City should be liable for violations of their constitutional rights because Chief Dembinsky, authorized the criminal investigation. (Dkt. 53 at 22)

This Court has already concluded that the record evidence supports a finding that Plaintiffs' constitutional rights were violated by the execution of the overbroad search warrant. Now, the Court must consider whether Defendant City "had a custom or policy that constituted deliberate indifference to [Plaintiffs'] constitutional right," or whether Plaintiffs' injury was caused by the unlawful action of someone with final policy making authority. Turner, 2011 U.S. App. LEXIS 3760, at *16-17; Doe, 604 F.3d at 1264; Maschmeir, 269 F. App'x at 943; Scala, 116 F. 3d at 1399.

Upon consideration of the record evidence, the Court finds that there is a factual dispute that precludes the Court's ruling on this issue. Chief Dembinsky testified that he is the policy maker for Defendant City:

> Q. And when a policy is approved for your agency, are you the person who approves the policies?
>
> A. Yes

Dembinsky Depo., Dkt. 53-1 at 21-22.   Chief Dembinsky also declared that he authorized the operation to execute the search warrant.   <u>See</u> Defendant's Answers to Interrogatories, Dkt. 53-2 at 4.   He maintains, apparently even with the full benefit of hindsight, that probable cause to search the Club existed and the search warrant was lawful.   Dembinsky Depo., Dkt. 53-1 at 47, 68.   However, he testified that he had not read the "all persons" warrant:

> Q. Was the warrant run by you before it was submitted to the court?
>
> A. I think the words were, We're on our way to the State Attorney's to get this warrant.  Have a good time.
>
> Q. So you did not review it?
>
> A. No. Why would I?
>
> Q. Do you sometimes review warrants?
>
> A. No.

<u>Id.</u> at 67.

Chief Dembinsky testified that a department-wide policy on conducting strip searches existed and that it would have required Defendant Williams to obtain the permission of her supervisor before strip searching an individual.   (<u>Id.</u> at 21, 23). Chief Dembinsky testified that he had no knowledge of whether Defendant Williams obtained that permission or not.   (<u>Id.</u> at 23)   Record evidence demonstrates that, at the very least, Defendant City's strip search policy required the search to take place upon a showing of probable cause and outside the presence of others, especially members of the opposite sex.   <u>See</u> Defendant City's Answers to Interrogatories, Dkt. 53-2 at 54; <u>see</u> <u>also</u> Fla.

STAT. § 901.211(1)(a), (3).  Chief Dembinsky later admitted that the city lacked probable cause to search the individual plaintiffs and that the Plaintiffs were searched simply because they were employees of the Club present at the time the search warrant was executed. Dembinsky Depo., 53-1 at 46-48.  However, Chief Dembinsky was physically present at the Club for a period of time and observed the execution of the unlawful "all persons" warrant.  Dembinsky Depo., Dkt 53-1 at 23-27, 48-49, 57.

The record evidence also reveals that Chief Dembinsky watched Defendant Williams strip search several females "between the pool table and the bar" of the Club, in his full view.  Id.  Even if he was unsure of the existence of probable cause, Chief Dembinsky knew that the manner and means of the execution of the strip searches was unlawful, yet, as final policymaker he concedes he did nothing.  Id. at 49.   In his deposition testimony, he offers yet another suggestion—that at the time, he did not know what a strip search was and believed it to only encompass the most extreme body cavity and genital searches:

> Q. To the best of your knowledge, was the strip search that you indicated was done on three people at Biggins in accordance with the Florida Statutes?
>
> A. I don't know.
>
> . . . .
>
> Q. Let's talk about strip searches first.
>
> A. I do not believe there was any other - - what you call a strip search done.
>
> Q. Okay.  Well, so we have our terminology clear, what do you call a strip search?
>
> A. I've always understood that a strip search was a body cavity search.  That you would take your clothes off, bend over, show your anus and your vagina or lift up your penis.  I

used to work in a jail and that's want we did as - - we call a strip search, so this is new to me.

. . . .

Q. So when the City responds to the question whether a strip search occurred, we're using terminology something different from a body cavity search, correct?

A. No, I didn't say that.

. . . .

Q. And you've also told me that previously you believe strip searches were equivalent to body cavity searches, correct?

A. A body cavity search is part of a strip search.  I did not realize that it was separated into two separate types of searches and that an actual strip search has a little different definition that what I had assumed was a strip search.

. . . .

Q. And you also responded when I asked you whether a body cavity search was performed on the three individuals that the City acknowledges were subject to a strip search, you said, to your knowledge, no?

A. I did not - -

Q. Not a body cavity search?

A. I did not witness it.  I don't know.

Q. So when the City responds that a strip search was conducted on three named individuals, what is your understanding of the search that was conducted with respect to those three?

A. When I answered these interrogatories, I had looked up the actual definition and made my determination that a s trip search was a thorough search of the prisoner and their clothing, remove - -  wait a minute - -  removal or rearrangement of some or all of their clothing so as to permit visual or manual inspection of the genitals, buttocks, anus, breast, and I interpreted that to mean if you rearrange somebody's clothing that that would be interpreted as a strip search.

Q. Okay.

A. And that's why we answered the interrogatories the way we did.

Q. And when you were answering the interrogatories in that fashion, were you looking at the City's policy on strip searches to aid you?

A. Yes.

Dembinsky Depo., Dkt. 53-1 at 22, 30-31, 34-36. The suggestion that he didn't know what a strip search was is belied by the written policy itself and calls into substantial question Chief Dembinsky's overall veracity as to his involvement and as to his self-serving testimony concerning his knowledge of the scope of the warrant.[2]  As such, the Motions for Summary Judgment filed by Plaintiffs and Defendant City are both **DENIED** with respect to Counts I and II against Defendant City.

> ### D. Counts IV and V: There Is A Genuine Issue of Material Fact in Dispute Regarding Whether Defendant City Violated Plaintiffs' First Amendment Right Against Unconstitutional Prior Restraints

---

[2] The evidence of record also raises questions regarding the "inadequate training" theory of municipal liability.  Under this theory,

> Municipal policy or custom may include a failure to provide adequate training if the deficiency evidences a deliberate indifference to the rights of its inhabitants. To establish a city's deliberate indifference a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action. A city may be put on notice in two ways. First, if the city is aware that a pattern of constitutional violations exists, and nevertheless fails to provide adequate training, it is considered to be deliberately indifferent. Alternatively, deliberate indifference may be proven without evidence of prior incidents, if the likelihood for constitutional violation is so high that the need for training would be obvious.

Lewis v. City of W. Palm Beach, 561 F.3d 1288, 1293 (11th Cir. 2009) (internal quotations and citations omitted).

In the Complaint, Plaintiffs allege that after the law enforcement officers executed the warrant they ordered that the Club close for the remainder of the evening.  (Dkt. 1 ¶¶ 164-165, 178-79).  Plaintiffs maintain that the "closure order was intended to and had the actual effect of censoring Plaintiffs' speech and preventing Plaintiffs from disseminating their message of eroticism." (Id.  ¶¶ 169-170, 183-84)  Plaintiffs further contend that since the warrant was executed, officers employed with Defendant City "have come into the club for 'bar checks' several times a week and also park in the Biggins parking lot and on neighboring properties." (Id. ¶ 185)  Plaintiff states that they "believe that the Defendant are planning additional raids on [the Club] and are fearful that the Defendants will issue additional closure orders requiring Plaintiffs to vacate the premises and/or discontinue their dance performances." (Id. ¶ 186)

Generally, "[a] prior restraint on expression exists when the government can deny access to a form for expression before the expression occurs." United States v. Frandsen, 212 F.3d 1231, 1236-37 (11th Cir. 2000).   "Although prior restraints are not per se unconstitutional, there is a strong presumption against their constitutionality." Id. at 1237.  In Frandsen, the Eleventh Circuit acknowledged that the Supreme Court had established several "procedural safeguards that a prior restraint on protected expression must contain to obviate the dangers of censorship."  They are:

> (1)    The burden of going to court to suppress the speech, the burden of proof once in court, must rest with the government; (2) any restraint prior to a judicial determination may only be for a specified brief time period in order to preserve the status quo; and (3) an avenue for prompt judicial review of the censor's decision must be available.

Frandsen, 212 F.3d  at 1238.

Here, Defendant City presents a single challenge to Plaintiffs' prior restraint argument. It offers the testimony of Sergeant Fowler. In an affidavit, Sergeant Fowler stated that he did not order the Club to close and that no other officer on the scene was authorized to do so. Fowler Aff't., Dkt. 51-3 ¶ 6. Plaintiffs respond by directing the Court's attention to the testimony of Plaintiff Heather Buchannan. In a deposition, Plaintiff Buchannan testified that the Club closed for the evening after the raid was concluded:

> Q. How did it come about that you went home as opposed to danced more into the night?
>
> A. Well, they closed us down that night. They did not - - there was no opening back up. So we shut down and they let us go.

Buchannan Depo., Dkt, 49-6 at 112. Defendant City does not reply to Plaintiff Buchanan's assertions and rests on Sergeant Fowler's affidavit as its sole defense. Consequently, this Court is unable to consider any of the other <u>Frandsen</u> factors that are relevant to the prior restraint analysis. Upon consideration of the foregoing, this Court concludes that there is a factual dispute on this record regarding whether Defendant City closed down the Club for the evening after the search warrant was executed. The Court finds that this factual dispute precludes the Court's from granting summary judgment on this issue. Accordingly, Defendant City's Motion for Summary Judgment as to Counts IV and V is **DENIED**.[3]

### E. Count IX: Plaintiffs Are Not Entitled to Summary Judgment On Their State-Law Battery Claim Against Defendant City and Defendant Williams

---

[3] The Court notes that Plaintiffs do not move for summary judgment as to Counts IV and V. <u>See</u> (Dkt. 53)

Plaintiffs invoke this Court's supplemental jurisdiction[4] over the state-law claims of battery and intentional infliction of emotional distress.  (Dkt. 1 ¶¶ 240-251, 268-283)

Generally, an actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of another and (b) an offensive contact with the person of the other directly or indirectly results against the receiver's will.   City of Miami v. Sanders, 672 So. 2d 46, 47 (Fla. 3d DCA 1996). However, Florida Statute Section provides in pertinent part:

> No officer, employee, or agent of the state or of any of its subdivisions shall be held personally liable in tort . . . for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, **unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property** (emphasis added).

FLA. STAT. § 768.28(9)(a).  In Willingham v. City of Orlando, 929 So. 2d 43, 47-48 (Fla. 5th DCA 2006), the Fifth District Court of Appeal of Florida held that, under § 768.28(9)(a), an Orlando police officer is not liable in tort and is entitled to summary judgment against a plaintiff's state tort law claims, unless a plaintiff can prove that the officer's conduct was in bad faith, exhibited malicious purpose, or exhibited wanton and willful disregard of human rights, safety, or property.  In the context of § 768.28(9)(a), conduct committed in bad faith has been characterized as conduct acted out with actual malice.  Parker v. State Bd. of Regents Ex Rel. Florida State Univ., 724 So. 2d 163, 167

---

[4] This Court is a court of limited subject matter jurisdiction. Parties seeking to invoke that jurisdiction over a cause of action must show that the underlying claim is based upon either diversity jurisdiction or the existence of a federal question (i.e. "a civil action arising under the Constitution, laws, or treaties of the United States"), in which a private right of action has been created or is implied by legislative intent.  See 28 U.S.C. § 1331;  Am. Ass'n of People With Disabilities v. Harris, 605 F.3d 1124, 1133 (11th Cir. 2010) (citing Alexander v. Sandoval, 532 U.S. 275, 293 n.8 (2001)). Supplemental jurisdiction applies when there are ancillary "claims that are so related to claims in the action within [the] original jurisdiction [of the court] that they form part of the same case or controversy[.]"  28 U.S.C. § 1367(a).

(Fla. 1st DCA 1998). Conduct meeting the "wanton and willful" standard in the context of § 768.28(9)(a), must be "worse than gross negligence," Sierra v. Associated Marine Insts., Inc., 850 So. 2d 582, 593 (Fla. 5th DCA 2003), and "more reprehensible and unacceptable than mere intentional conduct." Richardson v. City of Pompano Beach, 511 So. 2d 1121, 1123 (Fla. 4th DCA 1987).

Here, Plaintiffs allege that Defendant Williams committed battery against them by initiating "offensive, non-consensual physical contact" and conducting a "strip search[ ] of each of the Plaintiffs in a public place, in the presence of persons of the opposite gender [.]" (Dkt. 1 ¶¶ 244-45) Plaintiffs further allege that Defendant Williams' "actions in conducting a strip search of the Plaintiffs, were taken intentionally, maliciously and with complete disregard for the Plaintiffs' constitutional rights." (Id. ¶ 249)

As this Court found in Section IV.B.2 of this Order, the strip search conducted by Plaintiffs was unreasonable under the circumstances, given the existence of existing case law and the department policy. These facts, along with the record evidence that the scope and intrusiveness of the strip search may have been decided by Defendant Williams without the input of any superior officer, could support a finding of willful/purposeful and wanton conduct on the part of the officer. Thus, Defendant Williams is not entitled to immunity under FLA. STAT. § 768.28(9)(a), and her Motion for Summary Judgment is **DENIED**. Plaintiffs' Motion on this issue is also **DENIED** as there is an issue of factual dispute regarding the reasonableness of Defendant Williams' actions. The Motions filed by Plaintiffs and Defendant City regarding Defendant City's liability for battery are also **DENIED**. As the record evidence demonstrates, there are

material facts in dispute concerning the municipality's liability for the unlawful strip search.

> **F. Count XI: There Is A Genuine Issue of Material Fact in Dispute Regarding Whether Plaintiffs Can Prevail On Their State-Law Claim of Intentional Infliction of Emotional Distress Against Defendant City and Defendant Williams**

Plaintiffs allege that due to the strip search, Defendant Williams and Defendant City caused them "great humiliation and embarrassment" and that, as a result, they "have suffered severe emotional harm and ongoing psychological injuries." (Dkt. 1 ¶¶ 278-79) Plaintiffs further contend that "Defendants acted recklessly and with complete indifference to Plaintiffs' right of privacy, and emotional and physical wellbeing." (Id. ¶ 280) In response, Defendant Williams maintains that FLA. STAT. § 768.28(9) shields her from Plaintiffs' state law claims and that her "physical contact with the Plaintiffs [did] not rise to a level that would preclude her from enjoying the protection of this statutory grant of immunity." (Dkt. 49 at 17)

It is well settled that to sustain a claim for intentional infliction of emotional distress in Florida, a plaintiff must prove "(1) deliberate or reckless infliction of mental suffering; (2) outrageous conduct by the defendant; (3) the conduct caused the emotional distress; and (4) the emotional distress was severe." Christman v. Walsh, No. 10-14127, 2011 U.S. App. LEXIS 4250, at * 8-9 (11th Cir. Mar. 2, 2011). "To demonstrate that the defendant engaged in outrageous conduct, the plaintiff must show that the defendant's actions were 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Id. at *9.

If the record evidence in this case is accepted, a reasonable fact finder could conclude that invading someone's bodily privacy, in a public setting, in the presence of members of the opposite sex, without legal justification, is outrageous. Accordingly, Defendant Williams' Motion for Summary Judgment on this issue is **DENIED**.[5] A material factual dispute exists as to whether or not Plaintiffs' alleged injuries were "severe." Plaintiffs allege that they were (Dkt. 1 ¶¶ 279, 282-83); Defendant Williams alleges that they were not (Dkt. 49 at 19).

Defendant City's Motion for Summary Judgment on this Claim is **DENIED**. Again, as the record evidence demonstrates, there are material facts in dispute concerning the municipality's liability for the unlawful strip search.

## V. Conclusion

Upon consideration of the foregoing, this Court hereby **ORDERS** that:

1. Defendant Wyman's Motion for Summary Judgment (Dkt. 50) is **DENIED** as to all counts. Defendant Wyman is not entitled to qualified immunity.

2. Defendant Williams' Motion for Summary Judgment (Dkt. 49) is **DENIED** as to all counts.

3. Defendant City's Motion for Summary Judgment (Dkt. 51) is **DENIED** as to all counts.

4. Plaintiffs' Motion for Summary Judgment (Dkt. 53) is **GRANTED in part** and **DENIED in part**;

   i. The Motion is **GRANTED** as to Count I against Defendant Wyman;

   ii. The Motion is **DENIED** as to Count I against Defendant City;

   iii. The Motion is **DENIED** as to Count II against Defendant Williams;

---

[5] The Court notes that Plaintiffs do not move for summary judgment as to Count XI. See (Dkt. 53)

iv.   The Motion is **DENIED** as to Count II against Defendant City; and

v.   The Motion is **DENIED** as to Count IX against <u>both</u>, Defendant

Williams and Defendant City.

**DONE** and **ORDERED** in Orlando, Florida, this 18th day of May 2011.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record
Any Unrepresented Parties